**UNITED STATES of America, Plaintiff,**

**v.**

**Mary Huey Wei FANG Chang, M.D. a/k/a Hui Fang, Mary Fang and Mary Chang and Peter Chang, Defendants.**

**No. Civil PJM 96–2354.**

United States District Court,
D. Maryland.

Sept. 12, 1996.

---

Kathleen McDermott, U.S. Attorney's Office, Baltimore, Maryland, for Plaintiff.

Michael Schatzow, Venable, Baetjer & Howard, Baltimore, Maryland, for Defendants.

## OPINION

MESSITTE, District Judge.

### I. INTRODUCTION

On July 29, 1996, pursuant to 18 U.S.C. § 1345(a), the United States filed a Verified Complaint for Injunctive Relief and Motion for Temporary and Preliminary Injunctive Relief against Defendants Mary H. Fang, M.D. and her husband Peter Chang. The Government alleges that Defendants are engaged in an ongoing or likely to reoccur scheme to defraud health care insurers in the submission of claims for reimbursement for medical services and supplies in violation of the federal mail fraud statute, 18 U.S.C. § 1341. Among other things, the Government seeks a freeze on a substantial portion of Defendants' assets. Pursuant to Fed. R.Civ.P. 65, the Court issued a temporary restraining order freezing all of Defendants' assets [1] and scheduled a hearing on the Government's request for a preliminary injunction for August 6, 1996. Defendants, through counsel, filed an opposition to the motion.

At the preliminary injunction hearing, the Government called several witnesses and offered a number of exhibits. Defendants, while present, did not testify, but through counsel introduced certain exhibits.

The Court has determined to grant preliminary injunctive relief to the Government,

---

**1.** The temporary restraining order was modified on July 31, 1996, to permit Defendants access to a joint bank account and to permit their brokerage firm to sell and reinvest assets in their Janney Montgomery Scott investment account.

The temporary restraining order and modification were entered pursuant to 18 U.S.C. § 1345 before the statute was amended by the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104–191, 110 Stat. 1936 (August 21, 1996) (the "1996 Act"). As will become apparent, the 1996 Act provides an alternative basis for injunctive relief in this case. The Pre-Act analysis, however, remains applicable following the amendment.

subject to the following findings of fact and conclusions of law.[2]

## II. *FINDINGS OF FACT*

1) Defendant Mary Huey Wei Fang Chang, M.D. is an internist licensed to practice medicine in the State of Maryland under the name Mary H. Fang.

2) Defendant Peter Y. Chang is Dr. Fang's husband.

3) The couple resides at 10931 Martingale Court, Potomac, Maryland.

4) Dr. Fang's medical practice and business office are located at 121 Congressional Lane, Suite 310, Rockville, Maryland.

5) Mr. Chang is an active participant in Dr. Fang's medical billing practices and from their home prepares claims for insurance reimbursement submitted to private and government health insurers.

6) In her dealings with various insurance companies, Dr. Fang has submitted claims for reimbursement under the names of Mary Fang, Hui Fang, and Mary Chang. Additionally, she has on occasion used the address of Mr. Chang's parents at 4514 Westbrook Lane, Kensington, Maryland, to receive insurance reimbursement payments.

7) In the course of investigating allegations of prescription and insurance fraud, Detective Carol Allen of the Montgomery County, Maryland, Special Investigations Unit, participated in an undercover operation posing as an insured named "Karen Montgomery." She arranged four appointments with Dr. Fang held on January 25, 1996; February 9, 1996; February 28, 1996 and April 18, 1996. Each of the appointments lasted approximately 20 minutes, none involved physical examinations, and at the conclusion of each Dr. Fang provided Detective Allen with a prescription for drugs.

8) In connection with providing medical services to "Karen Montgomery," Dr. Fang caused to be submitted to the Alliance Insurance Company four claims for reimbursement in which she represented that medical examinations up to 45 minutes had occurred. Government Exhibit 1. For two visits, Dr. Fang submitted a claim under the name Mary H. Fang, giving provider number 218–56–5110; a third claim submitted under the name Hui Fang gave as a business address the residence of Dr. Fang's in-laws; and a fourth claim submitted under the name Hui Fang and provider number 521404629 billed for a March 20, 1996 office visit that never occurred. On none of the four claims were the correct code procedures utilized. All the claims were apparently designed to enhance reimbursement. Government Exhibit 7.

9) Subsequent to the undercover operation, a search and seizure warrant was obtained from the Montgomery County Circuit Court. Government Exhibit 2. On July 10, 1996, the warrant was executed at the residential premises of Defendants, 10931 Martingale Court, Potomac, Maryland; at Dr. Fang's medical office; 121 Congressional Lane, Rockville, Maryland; and at her in-laws' residence, 4514 Westbrook Lane, Kensington, Maryland.

10) During the course of the search at the residential premises, thousands of insurance claim forms were found both in the name Mary Fang under provider number 218–56–5110 and in the name of Hui Fang under provider number 521404629. Other claim forms were found in the name of Mary Chang. Defendant Peter Chang advised Detective Allen at the time that he prepared all Dr. Fang's reimbursement claims and that the names Mary Fang and Hui Fang were used because insurance companies deemed Mary Fang's claims excessive. In order to receive payment, he stated, the name Hui Fang also had to be used.

11) At the residential premises, patient medical and billing files were found throughout the house, including in the master bathroom. As of that time, Dr. Fang maintained no patient or insurance files at her medical office.

12) John Siarkas, Senior Supervisor, Special Investigations Unit for Mid-Atlantic

---

**2.** The Court's temporary restraining order froze all of Defendant's assets, but at the close of the preliminary injunction proceeding, pending further order of the Court, the parties consented to a freeze limited to the Janney Montgomery Scott account.

Alliance of Medical Services (MAMSI), an organization representing several health maintenance organizations in Maryland, testified that the "Karen Montgomery" claim forms improperly achieved enhanced revenue. He indicated that his HMOs would not have paid the claims had they known the true circumstances. He explained that, while Mary H. Fang is a member provider of MAMSI and subject to reimbursement rates under the MAMSI contract, Hui Fang is not a participating provider and would be reimbursed at a higher rate than Mary Fang. He further testified that MAMSI has received a total of 513 claims in the amount of $51,525.70 under the name Hui Fang. Government Exhibit 8.

13) Mr. Siarkas testified that a participating physician submitting claims under a different name and provider number and designating her status as "non participating physician" would be difficult to detect or monitor in an insurer's billing system. His company only learned of the problem in the present case after being alerted by the law enforcement authorities.

14) Mr. Siarkas further testified that he personally compiled from Defendants' records a list of 30–40 insurance companies that have received claims from Defendants. He indicated that he was aware that the full list compiled by investigators reflects approximately 67 insurance companies that have received claims from Defendants.

15) Mary Hammond, an auditor with the U.S. Attorney's Office, testified that she reviewed four (4) of ten to twelve (10–12) boxes of claims seized from Defendants' residence. In the time available, she was able to determine that 1324 claims in the name of Hui Fang or Mary Chang, totaling $175,326.83, had been submitted and paid by various insurance companies. Government Exhibit 10. Ms. Hammond further testified that she had requested information from approximately 20 insurance companies regarding claims paid to Mary Fang, Hui Fang and Mary Chang. In response, Prudential Healthcare reported payments to Hui Fang, M.D. in the amount of $167,979.50 for the years 1993, 1994, and 1995. (No 1996 data were available.) Graphic Arts Benefits reported claims paid

under the Hui Fang provider number of $6,540.65.

16) On July 10, 1996, insurance checks payable to Hui Fang were seized. These checks totaled $4,999.51. The dates for the checks ranged from June 4, 1996 to July 5, 1996 and were issued by eleven (11) different insurance companies. Government Exhibit 11.

17) Special Agent Kelly Johnstone of the Food and Drug Administration's Office of Criminal Investigations testified that her agency investigated allegations that Dr. Fang was selling free drug samples to patients and billing insurance companies for the samples. She testified that her limited review of insurance claim forms showed that Dr. Fang had submitted claims for drugs for which there was no record of purchase by Dr. Fang. She testified that Dr. Fang's medical office was primarily stocked with free drug samples and that the only non-samples she observed were vitamin supplements.

18) Special Agent Johnstone testified that Dr. Fang told her she sometimes sold free drug samples to patients for $10.00 and at other times provided them for free. Dr. Fang admitted that she billed the insurers for drug samples.

19) Special Agent Johnstone also testified that Dr. Fang acknowledged that she sometimes billed for services she had not in fact rendered and also billed under the name Hui Fang in order to get around the insurance companies. Dr. Fang admitted that she has been engaged in this practice since 1992. Dr. Fang stated that her husband, Peter Chang, prepares all insurance claim forms at their home. She and her husband use the name "Hui" instead of Dr. Fang's legal name "Huey" because it looks better. Huey is the name on Dr. Fang's medical diploma and on certain insurance forms submitted on her behalf to her husband's insurance company. Government Exhibit 3. Insurance claim forms using the name Hui Fang have also carried the designation "non-participating physician."

20) Special Agent Johnstone testified that she conducted a review of the check registers

of several financial accounts belonging to or controlled by Mary Fang and/or Peter Chang. She noted that proceeds from insurance companies were deposited into an account in the name of Mary Fang ("the Business Account") and then transferred to a joint account in the name of Mary and Peter Chang ("the Chang Joint Account"). Money from the Business Account was also transferred to the parties' joint Janney Montgomery Scott investment accounts. The Chang Joint Account reflects $299,000 in business deposits from February 1996 to June 1996. The account also received $40,000 in rental payments and $2,000 in Mr. Chang's salary. Government Exhibit 13 at pp. 6–14.

21) Invoices or bills to patients for services rendered or insurance co-payments were found for less than ten percent (10%) of the claims reviewed.

22) Dr. Fang's net pretax income from her medical practice in 1994 was $512,000. Mr. Chang's income in 1994 was $64,000. Government Exhibit 4.

23) No physician with the names Hui Fang or Mary Chang is licensed to practice medicine in the State of Maryland. Government Exhibit 6.

24) The search of Defendants' residence also revealed that:

A) Some claim forms were filled out in the name "Y.K. Chang, M.D.," giving Peter Chang's social security number and listing his parents' address. Peter Chang is not a licensed physician in Maryland nor does he render medical services.

B) Claim forms were submitted to Prudential Insurance in the name of a patient named Fred McMillan giving as his address the residence of Peter Chang's parents.

C) As recently as May 1996, and for a period of months before then, Mary Fang submitted insurance claim forms in the name "Huey W. Chang" to her husband's insurance company, listing herself as the treating physician, and citing such afflictions as "headache," "sinusitis," "ulcers" and the like.

D) For one patient, Dr. Fang submitted insurance claims to two different insurance companies giving the same procedure code for the same day. One of the claims was submitted by "Mary Fang," the other by "Hui Fang." On another occasion, claims for the same patient for the same day for virtually identical services were submitted to three different insurance companies under the names Hui Fang and Mary Chang. Government Exhibit 3.

25) Mary Fang continues to conduct her medical practice and continues to request and accept insurance reimbursements.

26) The Government has not yet contacted all 67 insurance companies to verify the status of the possible claims in this case.

27) Since July 10, 1996 MAMSI has received claims under the name of Hui Fang. It has denied those claims because it is now aware of and has assisted the Government's investigation.

28) Defendants have submitted a copy of a form letter dated August 5, 1996 that was sent to 20 insurance companies. The letter suggests that Dr. Fang inadvertently sought reimbursement under both her Chinese name, Hui Fang, and her Americanized name, Mary Fang, and that she would not continue to do so.

On the basis of the foregoing, the Government contends that Defendants have engaged on a scheme to defraud health care insurers using the mails in violation of 18 U.S.C. § 1341.[3]

---

3. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the

## III. *CURRENT LAW*

Since they are relatively short, it will aid discussion to set out the applicable statute and its legislative history in their entirety.

Section 1345 of Title 18 of the United States Code, with the language added by the 1996 Act underscored, provides as follows:

(a)(1) If a person is—

(A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title;

(B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title), *or*

(C) *committing or about to commit a federal health care offense.*

the Attorney General may commence a civil action in any Federal court to enjoin such violation.

(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title) *or a Federal health care offense* or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—

(A) to enjoin such alienation or disposition of property; or

(B) for a restraining order to—

(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

(ii) appoint a temporary receiver to administer such restraining order.

(3) A permanent or temporary injunction or restraining order shall be granted without bond.

(b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such

---

person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

---

a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

18 U.S.C.A. § 1345 (West Supp.1996), *as amended by* Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104–191, § 247, 110 Stat. 1936, 2018 (August 21, 1996) (the "1996 Act"). The 1996 Act defines "Federal health care offense" to include a violation of the mail fraud statute, 18 U.S.C. § 1341, "if the violation . . . relates to a health care benefit program." 1996 Act, § 241(a), 110 Stat. at 2016. A "health care benefit program," in turn, is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Id.* § 241(b), 110 Stat. at 2016.

The key legislative history of § 1345 is as follows:

Part D—Injunctions Against Fraud

1. In general and present Federal law

Part D of title XII is designed to allow the Attorney General in appropriate cases to enjoin a violation of chapter 63 of title 18, United States Code, dealing with mail fraud, wire fraud, and, as amended by section 1108 of this bill, with bank fraud. A similar provision was contained in S. 1630, the Criminal Code Reform legislation approved by the Committee in the 97th Congress.

During its early history, the English court of chancery issued injunctions to restrain the commission of certain criminal acts. However, with the increasing stability of the English government, the need for the enforcement of the criminal laws by the

---

18 U.S.C. § 1341.

chancellors diminished until by the end of the 15th century it had ceased entirely. Thus, the rule became established under the common law that equity would not interfere by the issuance of an injunction to prevent the commission of crimes. Exceptions, however, soon developed to this general rule. Thus, if an act endangered property rights or was inimical to public health or safety, equity could enjoin such act regardless of whether the act was also made criminal by a statute. Today it is generally conceded that a legislature has the authority to authorize the enforcement of a criminal statute by injunction.

Congress has not, as a general practice, provided injunctive relief for the prevention of crimes about to take place. In certain fields, however, Congress has permitted the issuance of injunctions to restrain certain acts which may constitute criminal conduct or facilitate criminal conduct. Thus, injunctive relief has long been available for violation of the fraud provisions of the Securities and Exchange Act, and these provisions have been used by the Securities and Exchange Commission on numerous occasions with excellent results. In the Organized Crime Control Act of 1970 Congress authorized the issuance of injunctions and restraining orders in an effort to free interstate commerce from the corrupt control of organized crime. Similarly, the use of injunctions to prevent acts deemed detrimental to the economy is widespread in the antitrust field.

Another area where there is a great need for injunctive relief is in fraudulent scheme cases. While present law provides limited injunctive relief, this relief is inadequate. First, the relief is restricted to the detention of incoming mail. It does not reach the situation where letters continue to be sent to further a scheme and remittances are collected personally from the customer or to fraudulent schemes which do not entail the use of the mails. Second, the required administrative proceedings entail considerable delay which is compounded

by the extra time and energy necessary to bring an injunctive suit in the district court while the administrative proceedings are pending. Since the investigation of fraudulent schemes often takes months, if not years, before the case is ready for criminal prosecution, innocent people continue to be victimized while the investigation is in progress.

Experience has shown that even after indictment or the obtaining of a conviction, the perpetrators of fraudulent schemes continue to victimize the public. For these reasons, the Committee has concluded that whenever it appears that a person is engaged or is about to engage in a criminal fraud offense proscribed by chapter 63, the Attorney General should be empowered to bring suit to enjoin the fraudulent acts or practices.

2. Provisions of the bill, as reported

Part D of title XII adds a new section, 1345, to title 18 to allow the Attorney General to put a speedy end to a fraud scheme by seeking an injunction in Federal district court whenever he determines he has received sufficient evidence of a violation of chapter 63 to initiate such an action. The court is to grant such action as is warranted to prevent a continuing and substantial injury to the class of persons designed to be protected by the criminal statute allegedly being violated. As a civil action, the proceeding is governed by the Federal Rules of Civil Procedure, except that if an indictment has been returned the more restrictive discovery provisions of the Federal Rules of Criminal Procedure apply.

1984 U.S.C.C.A.N. 3182, 3539–40 (footnotes omitted).

With regard to Subparagraph (a)(1)(A) of § 1345—the portion that deals with non-banking, non-health care frauds, including mail fraud, the focus of this proceeding [4]—the Court notes that case law has added considerable gloss.[5] First, courts have held

---

4. The parties' briefs, arguments, and presentation of evidence predate and do not mention the 1996 Act.

5. All the cases of which the Court is aware that interpret § 1345 predate the 1996 Act.

that the statute not only authorizes injunctions against ongoing or likely to reoccur criminal acts; it may be used to freeze assets. *See, e.g., United States v. William Savran & Assocs., Inc.,* 755 F.Supp. 1165, 1183 (E.D.N.Y.1991); *United States v. Cen-Card Agency,* 724 F.Supp. 313, 318 (D.N.J.), *aff'd* in part and dismissed in part on other grounds, 961 F.2d 1569 (3d Cir.1992).[6]

Second, some courts have held that the Government need only show "probable cause" to obtain preliminary injunctive relief, *See Savran,* 755 F.Supp. at 1177; *United States v. Belden,* 714 F.Supp. 42, 45–46 (N.D.N.Y.1987); *United States v. Weingold,* 844 F.Supp. 1560, 1573 (D.N.J.1994). Others have held that the Government's showing must be by a "preponderance of the evidence." *See United States v. Brown,* 988 F.2d 658, 663 (6th Cir.1993); *United States v. Quadro Corp.,* 916 F.Supp. 613, 617 (E.D.Tex.1996); *United States v. Barnes,* 912 F.Supp. 1187, 1194–95 (N.D.Iowa 1996).

All courts which have addressed the issue suggest that any assets to be frozen must in some way be traceable to the allegedly illicit activity. *See, e.g., Brown,* 988 F.2d at 664; *Savran,* 755 F.Supp. at 1182–83; *United States v. Jones,* 652 F.Supp. 1559, 1560 (S.D.N.Y.1986); *cf. Kemp v. Peterson,* 940 F.2d 110, 113–14 (4th Cir.1991) (suggesting that preliminary injunction freezing assets in context of Interstate Land Sales Full Disclosure Act violations may be proper without respect to whether frozen funds are traceable to proceeds or profits from the violations). Most courts assign to the Government the burden of persuasion with regard to establishing which funds in possession of a defendant are tainted by the fraud. *See Savran,* 755 F.Supp. at 1183; *Quadro,* 916 F.Supp. at 619.[7] At least one court, however, has suggested that, once the Government establishes any tainted assets have gone into a given account in the hands of a defendant, the

burden shifts to the defendant to prove by a preponderance of the evidence what portion of the funds, if any, is untainted by fraud. *Savran,* 755 F.Supp. at 1184.

By its terms, § 1345 is limited to cases in which the Government can show that the defendant is engaged or about to engage in criminal fraud. § 1345; *see also Jones,* 652 F.Supp. at 1560. Few courts, however, appear to have addressed the elements of what constitutes a "present or likely to reoccur" fraud, as opposed to fraud completed in the past. *Cf. Belden,* 714 F.Supp. at 46 ("A showing that a scheme has been carried out in the past—even in the recent past—is relevant to the determination of the probability that such a scheme will be perpetrated in the future, but is not dispositive when other circumstances indicate that there is little danger that the scheme will continue into the future."). Additionally none have suggested, with respect to freezable assets, that the amount of the assets frozen should bear some reasonable relation to the ongoing or likely future fraud as opposed to past completed fraud.[8]

The paucity of case law and the sharp differences that exist in what little case law there is invites further analysis of the applicable law.

## IV. *ANALYSIS OF CURRENT LAW*

Section 1345(a)(1)(A) and its legislative history are silent on the issue of whether use of assets, as opposed to criminal activity, may be enjoined. Certainly the legislative history suggests that the statute was necessary in view of the presumed general unavailability of injunctions to enforce criminal law. 1984 U.S.C.C.A.N. at 3539–40. Recognizing that courts have been authorized to issue injunctions against criminal behavior in certain contexts in the past, Congress decided to authorize their issuance in connection with a number of different types of fraud. *Id.* Au-

---

6. The 1996 Act, of course, expressly authorizes an asset freeze in the case of a "Federal health care offense." 18 U.S.C. § 1345(a)(2).

7. Under the 1996 Act, the Court is expressly authorized to freeze property "traceable" to the Federal health care violation "or property of equivalent value." 18 U.S.C. § 1345(a)(2)(B).

8. The 1996 Act, by prohibiting the transfer of property traceable to the fraud, clearly intends that past funds may be frozen, without regard to the projected magnitude of the future fraud. 18 U.S.C. § 1345(a)(2)(B).

thority to freeze assets, however, seems simply to have been assumed. *See, e.g., Savran,* 755 F.Supp. at 1182 ("When a court is called upon to exercise its equitable powers, it is axiomatic that it may provide whatever relief is necessary and proper to do complete justice under the circumstances between the parties.") One of the problems with this assumption, however, is raised by consideration of Subparagraph (a)(2)(B) of § 1345. That subparagraph was added to specifically provide that, in banking fraud situations, the Attorney General may obtain an injunction to freeze accounts or their equivalent value. One may question why, if Congress intended that the Court's authority under Subparagraph (a)(1)(A) should also extend to asset freezes, it did not amend the statute to provide for that as well.[9] In a related context involving restraining orders against assets that may become the subject of forfeiture proceedings, Congress was careful to delineate with great precision the circumstances under which a post-indictment, pre-trial freeze of assets could be obtained. *See United States v. Thier,* 801 F.2d 1463 (5th Cir. 1986). At least one court, however, has held that Congress' failure to disavow prior case law favoring asset seizures under Subparagraph (a)(1) meant that Congress was endorsing the practice. *Brown,* 988 F.2d at 662–63.

The provenance of the "probable cause" standard is somewhat curious. Use of the term in the § 1345 context apparently had its origin in the case of *United States v. Belden,* 714 F.Supp. 42 (N.D.N.Y.1987), and was reiterated in the *Savran* case, a widely cited case interpreting § 1345. The curious feature is that in formulating the probable cause standard, the *Belden* court cited *United States Postal Serv. v. Beamish,* 466 F.2d 804 (3d Cir.1972), which seems clearly distinguishable from § 1345 cases because the statute under consideration there, 39 U.S.C. § 3007, expressly established "probable cause" as the standard for issuing a preliminary injunction. As posited by the *Beamish* court:

According to defendant the general rule applicable to the issuance of preliminary injunctive relief here applies requiring both a showing of irreparable interim harm should an injunction not issue and a finding by the court to that effect. *See Sims v. Greene,* 161 F.2d 87 (3d Cir.1947). We might agree with defendant were it not for the express language of § 3007 which authorized the preliminary injunctive relief here granted. *Section 3007 provides* that "the United States district court ... shall ... *upon a showing of probable cause to believe* [that § 3005] *is being violated,* enter a temporary restraining order and preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure...." The legislative history of the section is silent as to its intended interpretation. However, it appears that its controlling substantive standard is restricted to the probable cause showing of a § 3005 violation. We think that the reference to Rule 65 intends merely to delineate the procedural mechanics applicable to the hearing on probable cause, the notice requirements and the form of the order. It does not suggest incorporation into § 3007 of the common law standards, including that of irreparable harm, typically required of preliminary injunctions issued on the strength of Rule 65 alone.

466 F.2d at 806 (emphasis added). Why Congress, which presumably knew of the express "probable cause" language of § 3007, did not incorporate it when enacting § 1345 is open to question. Other than Congress' express desire to create a "speedy" remedy, it is not self-evident that a "probable cause" standard should apply to § 1345 cases.

As to the burden of persuasion, except for the general reference in the statute and legislative history to the Federal Rules of Civil Procedure, there is no discussion of the evidentiary burdens § 1345 imposes. But assuming any freeze of assets is authorized, one would further assume, in accordance with the usual rules of evidence, that the burden of persuasion would always remain with the party seeking the relief. *E.g., Ca-*

---

**9.** This is precisely what the 1996 Act authorized as to Federal health care offenses. That does

not, however, mean the authority to freeze assets in all § 1345 cases did not already exist.

*nal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974). The observation of the *Savran* court that because the defendant has greater access to knowledge about where his assets came from, he should have the burden of proving that the assets are not the product of any fraud may be an overstatement. *See Savran*, 755 F.Supp. at 1184. It is equally consistent with that observation to say that the burden of production of evidence shifts to defendants at some point, whereas the burden of persuasion never shifts from the Government.[10]

## V. *CONVENTIONAL PRELIMINARY INJUNCTION ANALYSIS*

■ The language of the statute and the legislative history provide the starting point. Of these, the most that can be said is that § 1345 refers to the Government's authority to seek injunctive relief "at any stage" and that the Federal Rules of Civil Procedure apply. The plain meaning of this would seem to be that conventional preliminary injunction analysis applies unless and until it proves fundamentally unworkable. In the Court's view, with only slight adaptation, not only does conventional preliminary injunction analysis apply; it is very much up to the job.

The authority of a legislature (here, Congress) to provide for injunctive relief against criminal activity is well established. *See generally* 42 Am.Jur.2d *Injunctions* § 159 (1969). Such action has been upheld as against claims of denial of due process, denial of the right of jury trial, denial of equal protection of the law, double jeopardy, ex post facto effect, enforcement of criminal law by civil action, authorization of punishment without indictment, and cruel and unusual punishment. *Id.; see also* Annotation, *Constitutionality of Statute Relating to Injunc-*

*tions Against Crime or Abatement of Nuisance Arising from Violation of Liquor Law*, 49 A.L.R. 635 (1927).

■ While asset freezes may not be common in criminal cases, the fact is they have been specifically authorized in conventional preliminary injunction settings. *See Kemp v. Peterson*, 940 F.2d 110, 113–14 (4th Cir. 1991); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 561 (9th Cir. 1992). While it used to be said that equity will not act where there is an adequate remedy at law, *i.e.* where damages may be recouped in an action at law, *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir.1994), that standard became outmoded some time ago, at least when the legislature speaks. For many years equity has countenanced injunctions despite the adequacy of a remedy at law. *See* 42 Am.Jur.2d *Injunctions* § 39 (1969) ("Where a statute pre-empting the field says nothing about an adequate remedy at law, it eliminates the ancient requirement that one who seeks an injunction must show that there is no adequate remedy at law.") (citing *Cox v. Cox*, 84 Idaho 513, 373 P.2d 929 (1962)). In short, if a court is expressly authorized to issue preliminary injunctions in cases suggesting criminal fraud, it is consistent with that grant and with the broad discretion that attends the issuance of such injunctions for the court to determine to freeze assets.

Any problem associated with the "probable cause" standard may be more apparent than real. While there have been various formulations of the standard of proof applicable in the conventional preliminary injunction setting, the usual standard is that of "reasonable probability." 11A Charles Alan Wright

---

10. This suggested allocation of burdens is reminiscent of the Title VII employment discrimination context, in which the *"McDonnell Douglas* test," *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), allocates burdens. Under that framework, once the plaintiff proves a prima facie case of discrimination, the defendant-employer must set forth a legitimate nondiscriminatory reason for its employment action. Plaintiff may then attempt to demonstrate that the reason is pretextual, but must also ultimately persuade that the real rea-

son for the employer's action was illegally discriminatory. *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir.1996) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)). *"McDonnell Douglas* leaves the burden of persuasion at all times with the plaintiff, and ... the employer's burden to 'articulate' a legitimate, nondiscriminatory reason is not a burden to persuade the trier.... Rather it is a burden of production." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011 (1st Cir.1979).

et al., *Federal Practice and Procedure* § 2948.3 (1995). But when the meaning of "reasonable probability" of conventional preliminary injunction analysis is compared with the meaning of "probable cause" in either the criminal or civil context, the results are remarkably similar. Thus *Black's Law Dictionary* speaks of "reasonable cause" as "such state of facts as would lead man of ordinary care and prudence to believe and conscientiously entertain honest and strong suspicion that person sought to be arrested is guilty of committing a crime." *Black's Law Dictionary* 1265 (6th ed. 1990). A separate entry defines "reasonable and probable cause" as "a suspicion founded upon circumstances sufficiently strong to warrant reasonable man in belief that charge is true." *Id.* Both entries cross-reference "probable cause," which is defined among other things as "[a] reasonable ground for belief in certain alleged facts." *Id.* at 1201. The substantial identity of these definitions is obvious.

■ It is true that courts have sometimes stated that preliminary injunctions should only issue where entitlement to relief is "clearly" established. *E.g., Hughes Network Sys., Inc. v. InterDigital Communications Corp.,* 17 F.3d 691 (4th Cir.1994). But it is also true that "[i]t is not necessary that the court be satisfied that the plaintiff will certainly prevail on the final hearing." 4 *Pomeroy's Equity Jurisprudence* (2d ed. 1919) § 1685 and cases cited therein; *see also Westmoreland Coal Co., Inc. v. International Union, United Mine Workers of America,* 910 F.2d 130, 135 (4th Cir.1990) ("A party seeking a preliminary injunction is not required to establish an absolute right to the relief requested, but need establish only 'probable right' to that relief.") (citations

omitted). Evidence sufficient to authorize the granting of a preliminary injunction may in fact be insufficient to maintain a like decision at a final trial on the merits. *Pomeroy* at n. 6. This makes sense both as a matter of logic and of policy. To posit that a party must prove to a reasonable probability that a fact is more likely so than not must mean that the party has to prove something less than that the fact is *actually* more likely so than not so, *i.e.* to prove something by a preponderance of evidence. As a matter of policy, if Congress contemplated a "speedy" way to get at the fruits of ongoing or likely to reoccur fraud, all that would seem necessary would be a strong albeit reasonable suspicion that the fraud is occurring or is likely to occur. Not insignificantly, *Pomeroy,* the foremost treatise on equity practice, openly embraces as the standard of proof in preliminary injunction cases " 'a probable right, and a probable danger that such right will be defeated, without the special interposition of the court,' is all that need be shown." *Id.* § 1685 (citing *Profile Cotton Mills v. Calhoun Water Co.,* 189 Ala. 181, 66 So. 50 (1914)). Given this background, the Court is prepared to conclude that the "reasonable probability" standard of conventional preliminary injunction analysis equates with "probable cause" and that it applies in the present case.[11]

■ The next issue is the extent of the assets that may be subjected to a freeze. Again, although § 1345 speaks of persons who are "violating or about to violate" a criminal fraud statute, courts addressing the issue have tended to freeze accumulated funds from the past. *See Quadro,* 916 F.Supp. at 619; *Brown,* 988 F.2d at 664.

---

11. This is a convenient point, however, to note a theoretical problem regarding the injunctive relief authorized by § 1345. Although the statute contemplates the possibility of injunctive relief at any stage of the proceedings, as a practical matter any preliminary injunction freezing assets will almost certainly be followed in timely fashion by a criminal proceeding. A permanent injunction freezing assets not followed by a criminal trial would be virtually impossible to justify and would undoubtedly invite serious constitutional challenge. *Compare United States v. Quadro Corp.,* 916 F.Supp. 613, 619–20 (E.D.Tex.

1996) (holding that court may freeze assets as part of preliminary injunction, but declining to do so because the Government did not show specific assets to be proceeds from fraudulent scheme) with *United States v. Quadro Corp.,* 928 F.Supp. 688, 699 (E.D.Tex.1996) (permanently enjoining defendants from doing certain acts but not maintaining permanent asset freeze).

But the fact that a permanent injunction may not be sought in practice in no way changes the civil nature of the § 1345 proceeding nor does it affect the validity of the preliminary injunction analysis.

The suggestion of some cases is that "what's past is prologue";[12] ill gotten gains over a period in the past are apt to be replicated by similar losses over a similar period in the future. *See Belden,* 714 F.Supp. at 46. Most courts, however, have simply assumed without discussion that the past funds are available, diminished, to be sure, by some measure of untainted funds. Here, too, conventional preliminary injunction analysis provides an answer. Injunctive relief by its very nature is prospective; it looks not to correct past wrongs but to prohibit future wrongs. *See* 42 Am.Jur.2d *Injunctions* § 159 (1969); *see also Savran,* 755 F.Supp. at 1178 ("Injunctive relief is authorized under section 1345 only when the alleged fraudulent scheme is ongoing and there exists a threat of continued perpetration; the statutory equitable remedy is not available for solely past violations."). But in conventional preliminary injunction analysis the likelihood of future harm only establishes entitlement to injunctive relief; it does not provide the measure of relief to be granted. Once a look-forward establishes that a preliminary injunction should issue, courts have traditionally looked back and taken into account any and all past funds that may be linked to the fraud. Conventional analysis does not attempt to estimate probable future loss, which in any event is a likely speculative enterprise. It is obviously far simpler to identify purportedly tainted funds in hand than to estimate the extent of funds not yet received. As with conventional preliminary injunctions, courts dealing with § 1345 have apparently understood this because they have consistently frozen past accumulated funds after looking forward to possible future harm.[13] The Court accepts that, consistent with conventional preliminary injunction analysis, once ongoing or likely to reoccur fraud is established to a reasonable probability, it is authorized to look-back at funds reasonably traceable to fraud and preliminarily impound the whole amount or, within the Court's broad discretion, any portion of it.

The Court next considers the issue of burden of proof. In conventional preliminary injunction analysis, the burden of persuasion always remains upon the party seeking preliminary injunctive relief; it never shifts. *See* Wright et al., *supra,* § 2948, at 129–30 (movant, by a clear showing, must carry the burden of persuasion); *Natural Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974, 983 (4th Cir.1992) (plaintiffs bear burden of proof in showing balance of harms favors injunctive relief); *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976) ("A preliminary injunction is an extraordinary remedy which is not available unless the plaintiffs carry their burden of persuasion as to all of the prerequisites."). There is no reason to vary that rule in the § 1345 context. This is not to say, however, that the burden of producing evidence may not at some point shift to the defendant; indeed, in the Court's view, it does. *See generally* 5 Lynn McLain, *Maryland Evidence: State and Federal* § 300.1 (1987 & Supp.1995) (while burden of production, which refers to the allocation between parties as to who must come forward with evidence in order to avoid the direction by the judge of an adverse judgment, may shift from one party to the other, burden of persuasion does not shift). Thus, if the Government establishes with reasonable probability that a defendant has received funds from questioned sources and commingled those funds among various accounts, it may well suffice if the Government simply establishes the fact of commingling. The burden of production would then fairly shift to the defendant to establish the extent to which other funds come from sources totally independent of the alleged illegal sources. In the circumstances of the present case, for example, where the illegal funds are alleged to be insurance reimbursements for Mary Fang's medical services, Defendants are undoubtedly in a better position to show that Peter Chang's salary or Defendants' rental income are non-traceable

**12.** William Shakespeare, *The Tempest,* act II, sc.i, 1.261 (1612).

**13.** Again, this is precisely what the 1996 Act authorizes with regard to Federal health care offenses. See Fn. 8, *supra.*

funds.[14] The Government will not automatically prevail if it proves the commingling, but consistent with the usual burden of production analysis, the defendant will run the risk of an adverse decision should she choose not to answer the Government's proof. *See* 2 Kenneth S. Broun et al., *McCormick on Evidence* 425 (John William Strong ed., 4th ed. 1992) ("The burden of producing evidence on an issue means the liability to an adverse ruling (generally a finding or directed verdict) if evidence on the issue has not been produced.").

Finally, to the extent that conventional preliminary injunction analysis is to be relied upon in the § 1345 context, it is appropriate to address the usual factors of preliminary injunction analysis which, as set forth in *Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189, 195–96 (4th Cir.1977), include:

1) The likelihood of irreparable harm to the plaintiff if the preliminary injunction is not granted;

2) The likelihood of harm to the defendant if the preliminary injunction is granted;

3) The likelihood plaintiff will succeed on the merits; and

4) The public interest.

The Fourth Circuit has developed a "precise analytical framework" as to these factors:

First, the party requesting preliminary relief must make a "clear showing" that he will suffer irreparable harm if the court denies his request. Second, if the party establishes irreparable harm, "the next step then for the court to take is to balance the likelihood of irreparable harm to the plaintiff from the failure to grant interim relief against the likelihood of harm to the defendant from the grant of such relief." Third, if the balance tips decidedly in favor of the party requesting preliminary relief, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." However, "if the balance does not tip decidedly there must be a strong probability of success on the merits." Fourth, the court must evaluate whether the public interest favors granting preliminary relief.

*Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994) (citations omitted).

 Conventional preliminary injunction analysis, it appears, in fact accommodates these factors when the legislature has enacted a criminal statute expressly providing for injunctive relief. First, as for irreparable harm, when a criminal statute provides for injunctive relief, once the illegal activity is demonstrated, irreparable harm is presumed; there is no need to demonstrate the inadequacy of a remedy at law. 42 Am.Jur.2d § 160; *Developments In the Law: Injunctions,* 78 Harv.L.Rev. 994, 1059 (1965). The theory is that by expressly making injunctive relief available in the criminal setting, Congress has already declared the fraudulent activity to be harmful. For the same reason, once the undesirable conduct is established, it is fair to conclude that the public interest will be served if appropriate injunctive relief is granted.

 The usual second step in conventional preliminary injunction analysis is the balancing of hardships—to the Plaintiff if the preliminary injunction does not issue, to the defendant if it does. In the context of a health care fraud case, of course, it is not a matter of hardship to the Government that weighs in the balance, but hardship to the insurance companies whose payments are being illegally solicited. To the extent the Government can demonstrate a reasonable probability that criminally fraudulent activity has in fact occurred, one may fairly conclude that the balance of hardships tips decidedly in favor of the Government. Moreover, the fact that Congress has expressly authorized preliminary injunctive relief in the criminal fraud context once again represents a legislative determination that the questions are "so

**14.** As it happens, however, the Government has demonstrated the non-traceability of those funds in this case.

serious, substantially difficult, and doubtful as to make them fair ground for litigation and thus more deliberate investigation." Even assuming the balance of hardship does not tip decidedly in favor of the Government, the stronger the probability of the Government succeeding on the merits, the greater its entitlement to preliminary injunctive relief. Finally, it is always the case that the Court is in a position to minimize potential harm to a defendant by exercising its discretion to allow the defendant access to sufficient funds to meet his or her needs for living expenses, counsel fees, and by limiting the duration of the freeze. *See U.S. v. Thier,* 801 F.2d 1463 (5th Cir.1986).

## VI. *LAW APPLIED TO THE FACTS*

■ A) The Court finds to a reasonable probability that Defendants are "violating or about to violate" the mail fraud statute, 18 U.S.C. § 1341.

1) Mary Fang, M.D., acting in concert with Peter Chang, utilizing the names Hui Fang, M.D. and Mary Chang, M.D., has used the mails to submit fraudulent insurance claims to insurance companies. There is no apparent legitimate basis for Dr. Fang to have submitted claims under different names, provider numbers and addresses. The Court concludes at this juncture that all insurance claims submitted in the names of Hui Fang and Mary Chang are false.

2) No less than eleven (11) and potentially 67 insurance companies have been or are being victimized by the Defendants' practice of using the names Hui Fang and Mary Chang under different provider numbers and addresses to obtain insurance reimbursement.

3) In an indeterminate number of insurance billings under the name Mary H. Fang, Defendants have engaged in billing for services not rendered, have sought reimbursement for more extensive services than actually provided, and have billed for free drug samples. The extent of damages to up to 67 insurance companies by reason of these practices is not yet quantifiable.

4) Defendants' apparently fraudulent billing practices are ongoing or reasonably likely to reoccur:

a) The practices have been pervasive and have gone on for at least 4 years;

b) Evidence of the questionable practices is from the recent past. The Government's undercover operation lasted from January to June 1996. Checks payable to Hui Fang for services dated as late as July 5, 1996 were seized on July 10, 1996;

c) Defendants continued to receive insurance reimbursements in the name of Hui Fang after July 10, 1996;

d) Claims in the name of Hui Fang were in process after July 10, 1996;

e) Dr. Fang continues to practice medicine and to interact with insurance companies;

f) Most of the insurance companies identified are unaware of Defendants' billing practices; and

g) The nature of the fraud at issue makes detection and monitoring for the protection of the public impossible.

■ 5) The fact that Defendants may have undertaken to notify insurers that Mary Fang and Hui Fang are one and the same person and that requests for reimbursement will no longer be submitted in both names is not dispositive. According to conventional preliminary injunction analysis, the mere declaration by a defendant that a challenged activity will cease, particularly when the filing of the injunction suit precipitated the declaration, does not preclude issuance of the injunction. 42 Am.Jur.2d *Injunctions* § 5 (1969). Courts look to a number of factors, including "the bona fides of the expressed intent not to repeat [the acts], the effectiveness of the discontinuance, and the character of past violations, particularly where the violations are a long-established practice of the persons to be enjoined." *Id.* (footnotes omitted).

Here Defendants' notice to insurers issued only in response to the Government's suit and, at least as of the date of the preliminary injunction proceeding, went to only 20 of 67 possible insurers. Moreover, the notice suggests that use of two names by Defendants

was due to mere inadvertence; there is no suggestion of the excessive billing, double-billing or phantom billing that the evidence tends to show. Defendants' apparent fraud is also of long standing, more than 4 years in duration. Finally, as part of her ongoing practice, Dr. Fang will continue to submit claims for reimbursements to insurance companies—in other words, she will use the very same procedure that facilitated submission of dubious claims in the past.

B) The Government has demonstrated to a reasonable probability that assets tainted by fraud have come into the hands of Defendants.

1) Of approximately twelve boxes of records seized, the four boxes examined contained 1324 Hui Fang or Mary Chang claims totaling $175,326.83. The average number of claims per box based on the four boxes was 331 (1324/4) and the average total of claims paid per box $43,831.70 ($175,326.83/4). Given the similar size and quantity of the uninspected boxes, it is reasonable to infer that the number of claims and amounts paid will be consistent for each box. It is therefore reasonable to estimate that the illicit claims paid for the approximately 12 boxes seized is $43,831.70 per box, totalling damages of the order of $525,970.00 (12 × $43,831).

2) Two insurance companies alone have suffered losses from fraudulent claims submitted by Hui Fang in the amount of $174,-520.15: (Prudential, $167,979.50/Government Exhibit 9); (Graphics, $6,540.65/Government Exhibit 9).

3) By Defendants' own admissions, an indeterminate number of billings have been made under the name Mary H. Fang for services that were never rendered, for services not truly reflective of those actually rendered and for free drug samples not intended for sale. The extent of damages to up to 67 insurance companies by reason of this practice is not yet quantifiable. Defendants' records are incomplete in this regard, but by their own admission their practices date back to 1992.

4) It is reasonable to infer that a substantial number of billings in the name of Mary Fang are illegitimate.

5) As a matter of practice, Dr. Fang deposits all insurance proceeds into her business account, then transfers these funds to other accounts in her sole name, in joint name with Peter Chang and in the names of their children. According to Defendants' 1994 state income tax return, Dr. Fang's medical practice accounts for over 75% of Defendants' annual income. It is reasonable to conclude as of this time that the majority of Dr. Fang's revenue is derived from improper billing practices employed since 1992.

6) Some of Defendants' current assets are from untainted sources, i.e. Mr. Chang's salary and rental payments from the parties' various properties.

The Court is unmoved by Defendants' argument that none of their funds should be seized because the Government has been unable to trace any questionable gains into Defendants' accounts with appropriate specificity. While there may be some cases where greater specificity will be called for, the Court is satisfied that in this particular case the Government has met its burden of persuasion as to traceability.[15] It has shown to a reasonable probability fraudulent practices pervading every aspect of Defendant Mary Fang's medical practice. Insurance proceeds have been traced to a specific business account, then transferred to several other accounts. The evidence further provides a basis for deducing the amount of the medical billings and the magnitude of insurance reimbursements deposited into the specified account while segregating funds representing Peter Chang's salary and the parties' rental income. In the absence of persuasive evidence from Defendants to the contrary, the Court concludes the Government has met its burden of persuasion. As the Government rightly notes, requiring it from the outset to titrate "good dollars versus bad" out of multiple accounts would work at cross-purposes to § 1345, which is to provide a "speedy" reme-

---

**15.** Again, under the 1996 amendment to Section 134 in Federal health care violation cases, the Court may freeze either the traceable funds or property of equivalent value. 18 U.S.C. § 1345(a)(2)(B).

dy in cases of ongoing or likely to reoccur fraud.

It remains for the Court to fashion the relief appropriate to the case.

## VI. *RELIEF*

■ Given the extraordinary leverage that a preliminary injunction can exert against a potential criminal fraud defendant, the Court grants the relief with utmost caution. First and foremost, whatever amount of assets may be frozen, it should be clear that that amount is always open to review by the Court. Indeed, if within a reasonable period of time, the Government should fail to go forward with criminal charges, the entire fund may be subject to release from the freeze order. Additionally, whatever magnitude of funds might be frozen, the Court enjoys broad discretion to make allowances for a defendant's needs for living expenses, counsel fees, and the like. *See United States v. Thier*, 801 F.2d 1463 (5th Cir.1986).

Based on the foregoing, the Court has determined that $1.0 million of Dr. Fang and Mr. Chang's assets should be preliminarily frozen. This approximates 50% of Dr. Fang's aggregate reported taxable income for the years 1992–1995. The Court will accomplish this freeze by continuing in effect the consent freeze on the parties' Janney Montgomery Scott investment account. Although that account has an approximate current market value of $1.4 million, because the value of the asset is capable of fluctuating downward over the next 6 months, the Court will freeze the asset in its entirety. This order, however, will expire 180 days from issuance. In the meantime, the Court will require the Government to provide defense counsel and the Court with bi-monthly reports of the status of the Government's proof regarding the extent of Defendants' alleged fraud and will expect the Government in good faith to specifically advise Defendants and the Court of any revised estimate regarding the extent of Defendants' alleged fraud. Based on such advice, Defendants may seek a reduction of the frozen funds, but at the same time, the Government, based on further investigation and evidence, may request an increase in the amount of the freeze. The Court, for good cause shown, will consider an extension of the freeze.

In addition to the freeze, Defendants will be preliminarily enjoined as follows:

A) They shall submit no false or improper claims for insurance reimbursement in the name Mary H. Fang;

B) They shall submit no claims for insurance reimbursement and shall not receive such reimbursement in the names Hui Fang, Mary Chang or Peter Chang or any other names except Mary H. Fang;

C) They shall sell no free drug samples to the public;

D) They shall bill no insurance companies for free drug samples;

E) By September 30, 1996, they shall submit to the U.S. Attorney all checks received since July 10, 1996 from all insurance companies in the name Hui Fang; and

F) They shall not alter or dispose of any record under their custody or control related to business or financial matters, patient records and billings, and insurance records and billings.