**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Clyde D. BROWN; Sharon Brown; and
Clyde D. Brown, M.D. and Associates,
Inc., Defendants–Appellants.**

**No. 92–3674.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 26, 1993.

Decided March 19, 1993.

Rehearing and Rehearing En Banc
Denied June 8, 1993.

James M. Coombe, Office of U.S. Atty., Cincinnati, OH, Deborah A. Solove (argued and briefed), Office of U.S. Atty., Columbus, OH, for plaintiff.

Glenn V. Whitaker (argued and briefed), Arthur E. Phelps, Jr., Vorys, Sater, Seymour & Pease, Cincinnati, OH, for defendants-appellants.

Before: MARTIN, MILBURN, and NORRIS, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Dr. Clyde Brown, his sister, and his incorporated medical practice appeal the district court's grant of a preliminary injunction freezing most of their assets pending a hearing on civil charges of Medicare fraud against the Browns. We remand the case so that the district court may determine which assets can be traced to the alleged fraudulent scheme, and may under the statute be frozen and thus avoid the possibility of freezing untainted assets.

Clyde Brown, Sharon Brown, and Clyde D. Brown, M.D., and Associates, Inc., appeal the district court's interlocutory order to freeze assets. Clyde D. Brown, M.D., is a licensed medical doctor in Cincinnati, Ohio. Approximately twenty-five percent of the Browns' income comes from treating individuals covered by three federal health care programs: Medicare, Railroad Retirement Board, and Civilian Health and Medical Program of the Uniformed Services.

For several years, there has been an investigation of Browns' overcharging the federal government for treatment of patients under Medicare, RRB, and CHAMPUS. On June 1, 1992, the United States sought a temporary restraining order without notice to the Browns pursuant to 18 U.S.C. § 1345 and the court's general equitable powers.

The United States in oral argument told the panel that this procedure was the only available remedy it had. For reasons which have not been adequately explained, it stated in response to a question that this was the only way payments to Dr. Brown could be stopped. It stated that the Justice Department could not request from the other agencies that payments be withheld pending the completion of the investigation. As incongruous as it sounds, the Secretary of Health and Human Services and the Secretary of Defense must continue to make payments under these programs even though they have reason to believe that they are being defrauded.

The United States' complaint accused the Browns of false-claims fraud in violation of 18 U.S.C. §§ 286 and 287 and mail fraud in violation of 18 U.S.C. § 1341 in connection with the following billing practices by the Browns: 1) billing for unperformed medical services; 2) performing and billing for medically unnecessary tests and services; 3) double-billing for medical services, including the practices of "unbundling" and "fragmentation," whereby services billed together for a set price are also billed again separately at an additional and substantially higher price; and 4) "upcoding," or billing for a more expensive service than that which is actually provided to the patients. The United States supported its allegations with ten sworn "declarations" from insurance-carrier employees, and ex-employees and patients of the Browns, as well as a variety of statistical and documentary evidence.

The district court issued a temporary restraining order effective June 2, 1992 which: 1) enjoined the Browns from making or conspiring to make false or fraudulent Medicare, RRB and CHAMPUS reimbursement claims; 2) ordered the Browns to preserve financial and accounting records, including bank records, which detailed the disposition of payments from the federal programs; 3) froze the Browns' funds held at any financial institution, excepting an allowed withdrawal not to exceed $10,000 per month for business expenses; 4) required the Browns to provide monthly financial reports detailing their financial condition; 5) required the Browns to provide discovery to the United States; and 6) authorized various insurance carriers to withhold further payments to the Browns. As an alternative to the first four provisions of the order, the Browns were permitted to post a surety bond of $650,000 to cover estimated damages of $400,000 plus $250,000 for investigative costs.

The temporary restraining order was twice extended by mutual consent of the parties until July 2. In separate, parallel forfeiture proceedings, the government also "seized" a parcel of real estate (the Browns' office) and seven bank accounts pursuant to 18 U.S.C. § 981. The real estate had an estimated value of approximately one million dollars, and the bank accounts were worth $50,000, although the assets were encumbered as security for other debt.

On July 2, the district court conducted a hearing on the application for a preliminary injunction to continue under the same terms as those contained in the temporary restraining order. The court indicated that it was inclined to grant the injunction, but noted that it would apply the four-part test enunciated in *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977), before granting the motion. The court considered whether the United States could show that: 1) it had a strong or substantial likelihood of success on the merits; 2) irreparable injury would result if the injunction were not granted; 3) no substantial harm would result to defendants or others; and 4) the public interest would be served by issuing the injunction. *Id.*

At the preliminary injunction hearing, the Browns argued that freezing the assets was unlawful under 18 U.S.C. § 1345, as amended in 1990, and that the freeze was also unnecessary because the United States had frozen other assets in the parallel proceedings and had other adequate remedies at law. The Browns also asserted that requiring them to defend this action would infringe their Fifth Amendment rights. State criminal charges have been brought against the Browns, but they have not been indicted for any federal crimes.

The district court granted a preliminary injunction under the same terms as the temporary restraining order, and set a trial on the merits for August 31. The court then determined that $10,000 per month was adequate to offset the Browns' business expenses. The district court indicated that it would not permit the Browns' assets to be frozen indefinitely, and warned the United States that if it could not be ready for trial on the merits within sixty days, the court would dismiss the action.

The Browns then filed this timely appeal. An earlier panel of this court denied their request for a stay of the injunction pending this appeal.

■ This case squarely presents a question of the congressional intent of 18 U.S.C. § 1345. The Browns argue that the plain language of the 1990 amendment to 18 U.S.C. § 1345 limits the district court's power to freeze assets to cases involving banking-law violations only. This court reviews such an issue of law *de novo*. *See, e.g., Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308 (6th Cir.), *cert. denied*, 488 U.S. 941, 946, 109 S.Ct. 363, 377, 102 L.Ed.2d 353, 365 (1988).

18 U.S.C. § 1345, sometimes referred to as the fraud injunction statute, came into existence as part of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 1205(a), 98 Stat. 1837, 2152 (1984). The provision originally read as follows:

> Whenever it shall appear that any person is engaged or is about to engage in any act which constitutes or will constitute a

violation of this chapter the Attorney General may initiate a civil proceeding in a district court of the United States to enjoin such violation.

The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

In 1988, Congress amended the statute slightly so that it explicitly applied to violations of 18 U.S.C. § 287 for fraudulent claims and 18 U.S.C. § 371 for conspiracy to defraud the United States. Pub.L. No. 100–690, § 7077, 102 Stat. 4181, 4406 (1988). More significant changes followed two years later. In 1990, in the wake of the multi-billion dollar savings and loan debacle, Congress amended 18 U.S.C. § 1345 as part of the Crime Control Act of 1990, Pub.L. No. 101–647, § 2521(b)(2), 104 Stat. 4789, 4865, 4925 (1990). Since the 1990 amendments, 18 U.S.C. § 1345 has read as follows:

(a)(1) If a person is—

(A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title; or

(B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title),

the Attorney General may commence a civil action in any Federal court to enjoin such violation.

(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title), or property

which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—

(A) to enjoin such alienation or disposition of property; or

(B) for a restraining order to—

(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

(ii) appoint a temporary receiver to administer such restraining order.

(3) A permanent or temporary injunction or restraining order shall be granted without bond.

(b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

Our main inquiry is whether 18 U.S.C. § 1345, as amended in 1990, gives the district court authority to freeze a large portion of a defendant's assets in a civil fraud suit that does not involve banking-law violations. The United States maintains that the court is empowered to attach funds through 18 U.S.C. § 1345(b) and under the equitable power of the district court. Specifically, it relies on the language granting the court the authority "to take such other action, as is warranted to prevent a continuing and substantial injury to the United States...." 18 U.S.C. § 1345(b). The Browns contend that the 1990 amendment limited the ability of the courts to freeze assets to only those cases involving banking-law violations.

■ The language of section 1345 does not provide guidance in addressing the is-

sue before us. The Browns' contention that the amended statute limited the asset-freeze remedy to banking-law violations is not supported by the language of section 1345. If Congress intended to implement such a restriction, Congress should have expressly included such a limit in the statute. Because the plain language of the statute does not explicitly restrict the district court's authority, we look to the legislative history of the statute and to prior court decisions to determine whether the district court's authority was limited.[1]

■ The legislative history of the original version of 18 U.S.C. § 1345 indicates that Congress perceived great need to expand the Attorney General's ability to seek injunctive relief in fraudulent scheme cases. S.Rep. No. 225, 98th Cong., 2d Sess. 401–02, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3539. The report noted that Congress had long made injunctive relief available for violation of the Securities Act of 1933 under 15 U.S.C. § 77t, and for violations of the Organized Crime Control Act under 18 U.S.C. § 1964, as well as for violations of antitrust laws. The legislative history did not address Medicare fraud specifically.

The legislative history of the 1990 amendment focuses on banking-law violations. By amending section 1345, Congress wanted to respond to the savings and loan scandal because "executives of thrift institutions and other associated with them enriched themselves by fraudulently diverting immense amounts of funds from those institutions." H.R.Rep. No. 101–681(1), 101st Cong., 2nd Sess. 74, *reprinted in* 1990 U.S.Code Cong. & Admin.News 6472. Legislative history indicates that the purpose of the amendment was to enhance the United States' ability to prevent banking-law violations and the wrongful disposition of assets after such violations have occurred. *Id.* at 6584. Congress neither discussed the use of asset freezes outside the

banking-law context nor did it limit their use to banking-law violations. Consequently, legislative history does not aid us significantly in the present case.

Decisions in other circuits provide some guidance on the issue of the court's authority to freeze assets in a case that does not involve a banking-law violation. We are, however, unaware of any case in the federal courts in which false Medicare claims have served as a predicate for the freezing of funds. Several different cases are useful in providing a general approach to the issue. In *United States v. William Savran & Assoc.*, 755 F.Supp. 1165, 1184–85 (E.D.N.Y.1991), the court froze funds related to a pyramid chain-letter scheme based upon the pre–1990 version of 18 U.S.C. § 1345. In *United States v. Cen–Card Agency/C.C.A.C.*, 724 F.Supp. 313 (D.N.J. 1989), *aff'd without op.*, 961 F.2d 1569 (3d Cir.1992), the defendant's assets were frozen under a broad preliminary injunction based on 18 U.S.C. § 1345 as well as 39 U.S.C. § 3007 ("Detention of mail for temporary periods"). One court refused to freeze the assets at issue without addressing a federal court's authority under the pre–1990 version of 18 U.S.C. § 1345 to take such a measure. *See United States v. Jones*, 652 F.Supp. 1559 (S.D.N.Y.1986). The *Jones* decision premised refusal to freeze assets on the fact that the assets at issue were not the "fruits of the scheme." *Id.* at 1560.

The Browns contend that 18 U.S.C. § 1345, as amended in 1990, limits the district court's ability to freeze assets to cases involving banking-law violations. After studying earlier and later versions of the statute, legislative history, and these cases, we conclude that the amendment in 1990 did not change the district court's ability to freeze assets. In the few decisions regarding the statute, the pre–1990 version has been held to vest the district courts with the authority to issue very broad relief at a

---

1. When statutory language is incapable of a clear meaning that can be applied to the question presented, judicial review of the legislative history of the statute is appropriate. *See United States v. Thompson/Center Arms Co.,* — U.S. —, — n. 8, 112 S.Ct. 2102, 2109 n. 8, 119

L.Ed.2d 308 (1992) ("The shrine [of legislative history] is well peopled (though it has room for [at least] one more) and its congregation has included such noted elders as Mr. Justice Frankfurter.").

preliminary injunction hearing by means of asset freezes and other measures not expressly provided for in section 1345. *See Savran*, 755 F.Supp. at 1182. The language of the pre–1990 version, which gave the district court the authority to enjoin the issue of false claims against the United States, or "take such other action, as is warranted to prevent a continuing and substantial injury," was carried forward into the new version of section 1345 as subsections (a)(1)(A) and (b). The new statute added subsections (a)(1)(B) and (a)(2)(A) and (B), which authorize the Attorney General to seek more specific remedies in the instance of banking-law violations.

In the 1990 version of the statute, subsection (a) authorizes the Attorney General to seek various relief, and subsection (b), which remained unchanged, grants broad remedial authority to the district court. Subsection (a)(1)(A), when read in conjunction with subsection (b), presents an appropriate statutory scheme for the Attorney General to seek an injunction and the district court to enjoin continued fraud in non-banking cases. Subsection (a)(2), when linked with subsection (b), operates similarly for cases involving banking-law violations.

Our reading of the amendment of 1990 does not limit the effect of the old language. A district court had the authority to freeze assets which were the "fruits of the fraud" under the pre–1990 version of section 1345. *See United States v. Jones*, 652 F.Supp. 1559, 1560 (S.D.N.Y.1986). Congress did not alter the district court's authority when it added language regarding banking-law violations. Consequently, asset freezes in cases not involving banking-law violations continue to be within the scope of 18 U.S.C. § 1345 after the statute was amended in 1990.

■■■ Our review of the district court's grant of a preliminary injunction is limited to a determination of whether the district court abused its discretion. *International Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 302 (6th Cir.1991). We consider whether an injunction should have been issued and whether, if an injunction

was appropriate, it was proper in scope. During oral argument, the United States indicated that it could not terminate Medicare payments to the Browns because it was prohibited from so acting. If the Attorney General is correct in this matter, the inability to discontinue Medicare payments is but one symptom of the national crisis in health care. If such is the case, some changes in the regulations are certainly warranted. The tension between the need to provide health care and to prevent fraud, however, cannot extend the scope of the powers of the federal courts. Dr. Brown may or may not have committed fraud, but the district court, in deciding whether to issue a preliminary injunction, may not punish him without first determining the extent of his illegal acts.

■■■ The United States bears the burden of proof of establishing that fraud has been committed, and the extent of that fraud, under section 1345. Actions under section 1345 are civil prosecutions, rather than criminal prosecutions. As such, some courts have compared section 1345 with the forfeiture section in the amended Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 881, and decided to apply the same burden of proof for each statute. *See, e.g., United States v. William Savran & Associates*, 755 F.Supp. 1165, 1183–84 (E.D.N.Y.1991). In regard to the burden of proof, the *Savran* court held that the defendant in a section 1345 action is required to show by a preponderance of the evidence which funds were not the proceeds of fraud after the government establishes probable cause to believe that defendants are currently engaged or again about to engage in a fraudulent scheme proscribed by section 1345. *Id.* at 1183. Although the *Savran* court placed the burden of proof on the defendant, the burden in civil actions has traditionally been placed on the plaintiff by a preponderance of the evidence. *See In re Winship*, 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). We adopt the traditional standard of proof for section 1345. To hold otherwise would provide the United States a substantial procedural ad-

vantage over traditional civil plaintiffs, which is not mandated by the language of section 1345.

■ The district court may only freeze assets that might be forfeitable to the United States in the event that fraud is established at trial. The district court froze all of the Browns' funds held at any financial institution except for an allowed withdrawal of $10,000 per month for business expenses. In doing so, the district court failed to distinguish between the proceeds from the alleged Medicare fraud and untainted funds from the seventy-five percent of the Browns' business that is unrelated to Medicare claims. As a result, we remand the case so that the district court can reevaluate the nature of the assets that it froze. The court may freeze only those assets related to the alleged fraud. Because we are remanding the case on this ground, we need not address the Browns' remaining arguments.