**UNITED STATES of America, Plaintiff**

v.

**PAYMENT PROCESSING CENTER, LLC, et al., Defendants.**

**Civil Action No. 06–00725.**

United States District Court,
E.D. Pennsylvania.

June 23, 2006.

Joel M. Sweet, Virginia A. Gibson, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Adam Z. Solomon, Andrew B. Lustigman, Sheldon Lustigman, The Lustigman Firm PC, New York, NY, Alexandra C. Gaugler, Gino J. Benedetti, Alexandra C. Gaugler, Miller Alfano & Raspanti PC, Stephen Lacheen, Lacheen Dixon Wittels & Greenberg LLP, Marc Durant, Durant & Durant, Shari Amster, Law Offices Durant & Durant, Stephen Lacheen, Lacheen Dixon Wittels & Greenberg LLP, Peter J. Scuderi, Peter F. Vaira, Jack L. Gruenstein, Vaira & Riley PC, Philadelphia, PA, for Defendant.

### *MEMORANDUM OPINION ORDER*

RICE, United States Magistrate Judge.

On February 21, 2006, the Hon. John R. Padova, United States District Court Judge, entered an Amended Temporary Restraining Order ("TRO") under 18 U.S.C. § 1345 enjoining defendant Payment Processing Center, LLC's ("PPC") business operations and restraining approximately $10 million. The TRO was converted to a Stipulated Preliminary Injunction Order on April 7, 2006. The government established probable cause the restrained property relates to a consumer fraud scheme in which PPC processed unsigned bank drafts procured through

fraudulent telemarketing.[1] Included in the restrained property is $2,344,347 in PPC account no. xxxxxxxxxx797 (the "797" account) at Wachovia Bank, N.A. ("Wachovia").

Wachovia seeks relief from the injunction, claiming the asset freeze is improper because § 1345 authorizes the restraint of property only where the alleged fraud constitutes a banking law violation (or a health care offense, which is not implicated here). In the alternative, Wachovia claims, in essence, the $2,344,347 in PPC's account 797 is Wachovia's money and does not belong to PPC. Resolution of who owns the funds in account 797 implicates the concept of provisional banking credits under the Uniform Commercial Code ("UCC") because Wachovia provisionally credited PPC's account in the amount of deposited drafts from third-party telemarketing transactions. Those credits, Wachovia claims, never became final because the payor banks refused to honor many of the drafts. As such, it argues, the funds credited to PPC in account 797 remain "provisional" or temporary and still belong to Wachovia. The parties consented to Judge Padova's referral of Wachovia's motion to me for adjudication.

 For the following reasons, Wachovia's motion is denied in part. Congress never intended § 1345 to be applied in the restrictive manner suggested by Wachovia. Accordingly, I hold § 1345 authorizes broad injunctive relief, including property restraints, for any violation of chapter 63

of the United States Code, such as mail and wire fraud, regardless whether the offense constitutes a banking law violation or health care fraud. Wachovia's second claim, however, raises evidentiary issues involving application of the UCC to the funds in account 797. The government is granted thirty (30) days to gather evidence to establish the restrained funds constitute final credits from Wachovia to PPC, and that the $2,344,347 belongs to PPC, not Wachovia, and is subject to restraint. A final evidentiary hearing to resolve the ownership issue will be held within ten (10) days of completion of the government's discovery period.

### I. Scope of § 1345

Section 1345 is a powerful weapon in the government's anti-fraud arsenal. In addition to authorizing injunctive relief to enjoin specified ongoing or contemplated crimes, the statute empowers courts to enter restraining orders, prohibitions, and "take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of person for whose protection the action is brought." *See* § 1345(b). As a result, civil suits under § 1345 are often used to preserve the status quo during a lengthy parallel criminal probe. *See* S.Rep. No. 225, 98th Cong., 2d Sess 401–02, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3539 (recognizing criminal investigation of fraud schemes "often takes months, if not years," while innocent people "continue to be victimized").[2]

1. The unsigned drafts are prepared by PPC using a consumer's bank routing and account information obtained by the telemarketers during a telephone call with the consumer. PPC then processes the allegedly fraudulent transaction by making the draft payable to the telemarketer and depositing the draft into PPC's Wachovia bank account. After deducting its payment processing fee, PPC pays the balance of the draft to the telemarketer. The government alleges PPC and its principals

knew, or were willfully blind to the fact that, telemarketers were defrauding consumers, and PPC's payment processing aided a massive consumer fraud scheme. Between April, 2005 and December, 2005, the government alleges, PPC processed approximately $142 million from telemarketers.

2. Neither the statute nor the case law address how long such property restraints may continue. The reasonableness of a restraint's du-

Wachovia suggests § 1345(a)(1) is narrowly crafted to enjoin only future or ongoing violations of the enumerated predicate offenses, *i.e.*, chapter 63 crimes, conspiracy and false claim offenses, banking law violations, and health care offenses. It does not authorize property restraints. Rather, Wachovia views § 1345(a)(2) as the sole statutory authority to restrain property, but only property obtained as a result of, or traceable to, banking law violations[3] or federal health care offenses, and not other § 1345(a)(1) predicate offenses such as mail and wire fraud.[4] Finally, Wachovia maintains § 1345(b)'s authority to enter orders or "take such other action" needed to prevent any continuing or ongoing injury, is merely a procedural guide for implementing § 1345(a)(1) injunctions. If § 1345(b) could be used to restrain property, Wachovia argues, it would render the specific property restraint provisions in § 1345(a)(2) superfluous, in violation of bedrock canons of statutory construction. *See United States v. Vampire Nation*, 451 F.3d 189, 200 (3d Cir.2006) (statute

must be interpreted to give meaning to all provisions and no part of the statute should be deemed superfluous or void).

Wachovia's reading ignores the plain language of § 1345. As enacted in 1984, § 1345 authorized the Attorney General to initiate a civil suit to enjoin the violation of "any act which constitutes or will constitute a violation of this chapter." As amended in 1990, § 1345(a)(1) retained the Attorney General's authority to enjoin violations of chapter 63, but added banking law violations as a predicate offense. In 1994, the predicate offenses were expanded to include federal health care offenses. Since its enactment in 1984, and through multiple amendment cycles, § 1345 has consistently authorized the Attorney General to commence a civil suit to enjoin a violation of "this chapter," which encompasses federal fraud provisions in §§ 1341–1350, including mail fraud and wire fraud.

Similarly, § 1345 has always featured the language now codified in § 1345(b), which grants broad equitable authority to enter a "restraining order or prohibition or

ration would depend on the facts and circumstances of each case applying the traditional standard for issuing an injunction.

3. Section 1345(a)(2) authorizes property restraints when a person is alienating or disposing of property, or intends to do so, and the property was obtained as a result of, or traceable to, a "banking law violation," as defined in 18 U.S.C. § 3322, or a federal health care offense. Section 3322(d)(1) defines "banking law violation" as a violation of, or conspiracy to violate: (a) § 215, 656, 657, 1005, 1006, 1007, 1014, 1344, 1956, 1957 (all of which involve offenses involving financial institutions or money laundering); (b) mail fraud or wire fraud affecting a financial institution; or (c) specified violations of Title 31 U.S.C. §§ 5311–5332 involving records and reports for currency transactions and monetary instruments.

4. The government's complaint alleges banking law violations, albeit in a summary fashion. It contends § 1345(a)(2) covers tel-

emarketing fraud that adversely impacts a financial institution in any way, *e.g.*, depleting bank assets or resources to investigate possible third-party misconduct even when the bank is not a victim of an offense. Cases applying § 1345 have not addressed the issue, and courts applying the term in other contexts are divided. *Compare United States v. Grass*, 274 F.Supp 2d. 648, 653–54 (M.D.Pa.2003) (civil forfeiture for fraud affecting a financial institution must have adverse impact on financial institution) *with United States v. Approx. $25,829,681.80*, 1999 WL 1080370 *5 (S.D.N.Y.1999) (in civil forfeiture for fraud, financial institution was affected even though it was not a victim because it had to file interpleader action). My conclusion that § 1345 authorizes restraint of property from any chapter 63 violation, such as mail or wire fraud, obviates the need to address the issue.

take such other action" necessary to prevent "a continuing and substantial injury." This omnibus provision includes authority to restrain property obtained from, or traceable to, mail or wire fraud. *Cf. New York Public Interest Research Group, Inc. v. Whitman*, 214 F.Supp.2d 1, 4 (D.D.C. 2002) (contrasting the broad equitable power to fashion appropriate remedies in § 1345(b) with the more restrictive injunctive authority in the Clean Air Act).

Judicial application of § 1345 before the 1990 amendment expanding its reach supports this view. For example, in *United States v. William Savran & Assoc.*, 755 F.Supp. 1165, 1184–85 (E.D.N.Y.1991), the court applied the pre–1990 version of § 1345 to freeze funds related to a pyramid chain-letter scheme, in violation of the mail fraud statute, 18 U.S.C. § 1341. Similarly, in *United States v. Cen–Card Agency/C.C.A.C.*, No. 88–5764, 1989 WL 30653 (3d Cir. March 23, 1989) (unpublished), the court affirmed § 1345's constitutionality and upheld an injunction that featured an asset freeze stemming from mail and wire fraud violations. *Id.* 1989 WL 30653, at 5, 10–11, 15. Writing for our court of appeals, now-Chief Judge Scirica noted § 1345 "provides a civil injunctive remedy for actions which may be a violation under chapter 63 of Title 18. Possible substantive offenses relevant to this case are mail fraud, 18 U.S.C. § 1341 and wire fraud, 18 U.S.C. § 1343." *Id.*, 1989 WL 30653, at *16; *see also United States v. Brown*, 988 F.2d 658, 663 (6th Cir.1993) (pre–1990 version of § 1345 vested district court with authority to issue "very broad relief," including an asset freeze). Although the court in *Cen–Card* was not presented with the precise question Wachovia poses, its decision rests on the premise that § 1345 empowered the district court to restrain

property obtained by, or traceable to, mail or wire fraud violations.

Wachovia's reading of § 1345(a)(1) would authorize a court to shutdown an ongoing fraud scheme, but would bar restraint of ill-gotten gains from the same scheme unless the offense involved banking or health care violations. It defies logic to suggest Congress sought to halt ongoing criminal activity, but simultaneously opted to leave victim funds unprotected during a lengthy criminal investigation or ongoing civil suit. *See Clinton v. City of New York*, 524 U.S. 417, 429, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (rejecting statutory construction that "would produce an absurd and unjust result which Congress could not have intended"); *United States v. Polanco*, 451 F.3d 308, 310–11 (3d Cir.2006) (declining to read child pornography statute in a manner that would suggest Congress intended to create child pornography havens in U.S. territories, commonwealths, and national parks). Fraud continues as long as the underlying scheme persists. A scheme continues only as long as defendants profit. Money fuels the engine of fraud by enriching defendants. At least since 1988, Congress has recognized these stark realities by granting courts broad injunctive powers in § 1345.[5]

▮ This statutory framework does not render § 1345(a)(2) superfluous. Section 1345(a)(2) "authorizes the Attorney General to seek more specific remedies in the instance of banking law violations and health care offenses." *Brown*, 988 F.2d at 663. To give meaning to all provisions in the statute, *see Bailey v. United States*, 516 U.S. 137, 145–46, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), § 1345(a)(2) must be read as granting the Attorney General additional authority to restrain property gen-

---

5. The cases cited by Wachovia do not alter the analysis. *See* Wachovia Brief at 7. They fail to address § 1345 violations, and are limited to interpreting the term "affecting a financial institution" in the context of forfeiture, sentencing, and bank fraud offenses.

erated from past, *i.e.*, completed, banking law violations or health care offenses when such property is being concealed or dissipated. Section 1345(a)(2) requires proof that: (1) a person is alienating or disposing of property, or intending to do so; and (2) the property was obtained as a result of, or traceable to, a banking law violation or federal health care offense, or was equivalent value of such property. By using the past tense ("obtained"), Congress granted additional authority in § 1345(a)(2) to protect assets derived from already completed banking and health care offenses, not simply those that are ongoing or contemplated, as it specified in § 1345(a)(1). Thus, the omnibus injunctive authority to restrain property in § 1345(b) is limited to any ongoing or anticipated violations of offenses enumerated in § 1345(a)(1)(A), (B) and (C), including mail and wire fraud. This reading is supported by Congress' reference in § 1345(a)(1) to persons who are "violating or about to violate," *see* § 1345(a)(1)(A), and persons who are "committing or about to commit," *see* § 1345(a)(1)(B), (C). Such language contemplates injunctive relief only for ongoing or prospective criminal acts. *See, e.g. United States v. Barnes,* 912 F.Supp. 1187, 1196 (N.D.Iowa 1996). Under § 1345(a)(1), therefore, the Attorney General could not seek a property restraint if the mail or wire fraud scheme was completed—regardless how egregious the crime was or how bold the asset dissipation may be. Immediate resort to criminal prosecution and asset forfeiture laws would be required. *See, e.g.* 18 U.S.C. §§ 981 (civil forfeiture); 982 (criminal forfeiture); *Vampire Nation,* 451 F.3d 189, 198–201 n. 9 (outlining requirements for civil and criminal forfeiture in mail fraud cases). Under § 1345(a)(2), however, the

Attorney General could restrain proceeds from an already completed banking law violation, *e.g.,* bank bribery proceeds under § 215, or bank embezzlement proceeds under § 656, without immediate resort to the criminal process or statutory forfeiture and its myriad procedural hurdles. Congress gave courts enhanced authority under § 1345(a)(2) to address abuses from banking and health care scandals of the late 1980s and early 1990s.[6]

To the extent the statutory language is ambiguous, legislative history of the 1984 enactment supports the expansive view that § 1345 gave the Attorney General the ability to enjoin any violation of chapter 63 dealing with "mail fraud, wire fraud, and bank fraud." *See* S.Rep. No. 225, 98th Cong., 2d Sess 401–02, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3539. Such broad relief was merited, Congress believed, because existing law to enjoin fraudulent schemes was limited to detaining incoming mail, which was deemed "inadequate." *Id.* As a result, § 1345 was enacted to allow the Attorney General to "put a speedy end to a fraud scheme by seeking an injunction in federal district court whenever he determines he has received sufficient evidence of a violation of chapter 63 to initiate such an action." *Id.* Ending a fraud scheme would be a hollow remedy if the scheme's architects were permitted to liquidate or conceal property from the same fraud, or use ill-gotten gains to flee, while the Attorney General pursued a civil suit or presented the case to a grand jury.

In 1990, Congress expanded this broad authority. In response to the savings and loan banking crisis in the late 1980s, Congress enacted a series of laws to enhance the federal government's ability to investi-

---

**6.** Although § 1345(a)(2) is limited to banking law violations and health care offenses, its framework and legal requirements provide a useful template for courts that impose proper-ty restraints under § 1345(b) for other predicate offenses, such as mail fraud and wire fraud.

gate and prosecute bank-related offenses. One such measure expanded § 1345 to include a plethora of new and existing "banking law" violations enumerated in § 3322(d). This amendment increased § 1345's coverage beyond the violations in chapter 63, which addressed bank offenses only in § 1344 (making it unlawful to defraud a federally insured financial institution). *See* H.R.Rep. No. 101–681(1), 101st Cong., 2d Sess. 74, *reprinted in* 1990 U.S.Code & Admin. News 6476–77, 6584; *see also Brown* 988 F.2d at 662. The new law was designed to "enhance the ability of the Justice Department and federal bank regulatory agencies to prevent dissipation of property and assets" and "expands 18 U.S.C. § 1345, which authorizes the Attorney General to bring a civil action to enjoin a violation of 18 U.S.C. ch. 63 (mail fraud)." 1999 U.S.Code & Admin. News 6584–85. Congress did not grant the Justice Department new property restraint power in 1990; rather, it sought to "enhance" existing authority that had existed in § 1345(b) since 1988.

This statutory interpretation, viewed either alone or with the legislative history, is consistent with a statutory mechanism designed to empower courts with sweeping authority to restrain property as part of a § 1345 injunction. Thus, § 1345 was properly invoked here.

## II. Provisional Credits in Account 797

■ Wachovia claims PPC has a fictitious interest in the $2,344,347 in account 797. *See* Wachovia Br. at 8. Pursuant to the UCC, Wachovia was required to give PPC only a provisional credit for drafts deposited that have not yet been paid, *see* 13 Pa. Cons.Stat. Ann. § 4201(a), and such credit may be revoked at any time before the deposit becomes final. *Id.;* § 4214(a). Thus, when a deposit item provisionally credited is later dishonored or suspended, Wachovia may charge back the credit and obtain a refund from PPC, its customer. Since Judge Padova entered the TRO on February 21, 2006, payor banks have dishonored drafts Wachovia had credited to PPC's account. This amount totals $2,083,642, and Wachovia has not honored additional payor bank return requests totaling $260,705.

The government contends the "vast majority" of the credits to account 797 had become final in the ordinary course of business before the February 21, 2006 TRO. It argues Wachovia's provisional credits had become final because the payor banks failed to meet the deadlines to dishonor the drafts. In the alternative, the government suggests Wachovia bears the burden of proving the provisional credits never became final.

The government fails to acknowledge, however, that as a threshold matter it was required to submit evidence establishing probable cause that the funds in account 797 were subject to restraint under § 1345. Relying on the government's claim that the funds belonged to PPC, Judge Padova froze account 797 (and other accounts) pursuant to § 1345 as property obtained as a result of, or traceable to, § 1345 predicate offenses, or property of equivalent value that defendants had the ability to remove. If, as Wachovia asserts, the funds in account 797 never became PPC's property and remained mere provisional credits from Wachovia, the $2,344,347 was not subject to restraint under § 1345.[7]

---

7. The government does not allege Wachovia was a participant in the alleged fraud. The government suggests, however, that even if the credits were final, Wachovia must have exercised its chargeback right in good faith, thereby requiring inquiry into Wachovia's alleged knowledge of any fraud. To justify restraint of account 797, the government would be required to offer evidence of such knowledge as of February 21, 2006, when Judge

Based on the assumption that a deposited draft will be paid by the drawer, Wachovia provisionally placed the value of the draft into PPC's account 797. The draft was then forwarded to a bank clearinghouse or transferor bank for collection. The value of the draft was then shifted from the clearinghouse account of the payor bank to the clearinghouse account of the depositary bank. Unless the payor bank timely revoked the provisional credit under § 4301 of Pennsylvania UCC, the payor bank is deemed to have finally paid the draft and is accountable to the depositary bank, *i.e.*, Wachovia, for the full amount. *See generally NBT Bank, Nat. Ass'n v. First Nat'l Community Bank*, 393 F.3d 404, 407–18 (3d Cir.2004). Thus, the provisional credit follows the PPC bank draft from bank to bank until the draft becomes final.

Resolution of Wachovia's claim, therefore, depends on the history of each draft and whether the draft was dishonored or returned pursuant Pennsylvania's UCC. *See* 13 Pa. Cons.Stat. Ann. §§ 4301, 4302, 4315. As the affidavit from the government's expert, Professor Amelia H. Boss of the Temple University School of Law, notes, the finality of a provisional credit cannot be resolved absent evidence that the payor bank gave notice of the dishonor and returned the check in the time and manner required by law or under applicable clearinghouse rules or agreements. *See* Gov't Exh. "B." [8]

The burden of proving the finality of a provisional credit, however, remains with the government since § 1345 contemplates restraint of property obtained as a result of, or traceable to, predicate violations, or property of equivalent value that defendants could remove. Section 1345 does not authorize restraint of property of innocent third parties absent some link to the predicate violations or a person engaged in such violations. *See* § 1345(a). Although Wachovia seeks relief from the restraint on funds in account 797, it does so on the theory that the government cannot prove the funds were property of PPC. Unlike the focus on the other defendants, *i.e.*, PPC and its principals, the government did not petition Judge Padova in February, 2006 to restrain account 797 on the theory that Wachovia was a participant in the underlying fraud scheme. Rather, as set forth in paragraphs 196–213 of its complaint, the government alleged "PPC's bank accounts are tainted with proceeds of telemarketing fraud." These accounts included account 797, which the government alleged was PPC's "primary account for depositing of bank drafts relating to telemarketing fraud." *See* para. 196–97 (noting three named defendants who control PPC are signatories on account 797).

Wachovia is not a named defendant seeking relief from a restraint on property traceable to criminal activity. In such a case, the defendant would bear the burden of producing evidence that the restrained funds are not fraud related. *Cf. Longen-*

Padova entered the TRO. Otherwise, it would be required to file an amended complaint and seek additional relief from Judge Padova based on any new evidence it has uncovered.

**8.** Wachovia also contends its standard Deposit Agreement and Disclosures for Commercial Accounts agreement with PPC allows it to override the UCC, *see* § 4–103(a), because the parties agreed any returned deposit item remains provisional and is not final. It is un-

clear at this stage what the precise agreement was between PPC and Wachovia and whether it creates rights beyond Wachovia's contractual right to seek reimbursement from PPC for returned deposit items. In addition, the government alleges Wachovia's reliance on § 4–103 will require inquiry into Wachovia's "good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." *Id.*

*ette v. Krusing,* 322 F.3d 758, 766 n. 11 (3d Cir.2003) ("innocent owner" claimant in civil drug forfeiture case asserts an affirmative defense and must prove by a preponderance of the evidence that proceeds are his and he was unaware of proceeds' criminal connection). Rather, Wachovia characterizes itself as a third party whose funds were improperly restrained on the belief the funds in account 797 had become the property of PPC. Viewed as such, the burden remains with the government to establish the nature of the restrained property. In this case, therefore, the traditional burden shifting rules do not control. *Compare United States v. Fang,* 937 F.Supp. 1186, 1198–99 (D.Md.1996) (once government establishes with reasonable probability account contains commingled fraud proceeds, burden of production shifts to defendant to establish extent to which account contains unclean funds).

Although § 1345 is not a conventional civil injunction statute, *see United States v. Sriram,* 147 F.Supp.2d 914, 935 (N.D.Ill. 2001) (passage of § 1345 constituted implied finding that violation will harm public and is subject to restraint), Wachovia's unique role requires the government to prove why account 797 should be restrained.[9] A preliminary injunction is "an extraordinary and drastic remedy" for which the moving party, *i.e.,* the government, bears the burden of persuasion. *See Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). By presenting evidence that it provisionally credited PPC account 797, Wachovia sufficiently met its burden of production to challenge ownership of the funds in account 797. Accordingly, the government retains its burden of persuasion on the precise nature of the funds because it bears the risk of failing to establish the funds are linked to fraudulent activity. *See generally Schaffer v. Weast,* — U.S. ——, 126 S.Ct. 528, 533–34, 163 L.Ed.2d 387 (2005) (discussing the distinction between "burden of proof" and "burden of persuasion" in the context of the Individuals with Disabilities in Education Act ("IDEA")).

The underlying statute guides the allocation of burdens, *id.,* and § 1345 requires the government to establish probable cause that specific property such as account 797 should be restrained because it was obtained as a result of fraud or is traceable to fraud. Wachovia's claim involves an inquiry into ownership of the funds, not an exemption or an affirmative defense. *Id.* at 534–35. Shifting the burden of persuasion to Wachovia at this stage, as the government suggests, would give the government a tactical advantage it would not have enjoyed if the issue of provisional credits had been addressed in the first instance when the TRO was issued. *Cf. Alaska Dep't of Environmental Conserv. v. EPA,* 540 U.S. 461, 493–94, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (Clean Air Act does not allow EPA to gain a proof-related tactical advantage depending upon which enforcement tool it employs).

Accordingly, I will grant the government thirty (30) days to take discovery and present evidence sufficient to demonstrate the finality of the provisional credits Wachovia made to PPC in account 797. An appropriate Order follows.

### ORDER

AND NOW, this 23rd day of June, 2006, upon consideration of the motion for relief

---

9. Wachovia also possesses specialized knowledge and expertise in this area. That factor alone, however, does not merit relieving the government of its burden of establishing probable cause the funds are subject to restraint. Moreover, Wachovia pledged at oral argument to fully cooperate with the government's discovery requests to pinpoint the finality of any provisional credits.

from stay and to exempt Wachovia Bank, N.A. from the April 7, 2006 stipulated preliminary injunction order as to all defendants (Document # 108), the government's response thereto (Document # 127), and after oral argument on June 21, 2006, it is HEREBY ORDERED that Wachovia's motion is denied in part:

1. § 1345 was appropriately used in this case to restrain property from a mail or wire fraud violation;

2. The government is granted thirty (30) days to conduct discovery and offer evidence that the restrained funds constitute final credits from Wachovia to PPC, and that the $2,344,347 belongs to PPC, not Wachovia, and is subject to restraint. A final evidentiary hearing to resolve the ownership issue will be held within ten (10) days of completion of the government's discovery period. The precise date will be set after consultation with the parties and based on their joint availability.